IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KAP HOLDINGS, LLC, d/b/a PARTSCRIPTION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MAR-CONE APPLIANCE PARTS CO., )<br>)<br>Defendant. ) | Case No. 21 C 5648<br><br>Judge Joan H. Lefkow |

## OPINION AND ORDER

KAP Holdings, LLC, d/b/a/ PartScription, has brought an action against Mar-Cone Appliance Parts Co. (Marcone) for breach of an oral agreement to form a partnership. (Dkt. 1-1.)[1] Marcone moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 11.) The motion is granted.

## BACKGROUND

PartScription's complaint alleges the following. As far back as 2006, Kevin Price was trying to establish a business relationship with Marcone to run an e-commerce platform for appliance parts. (Dkt. 1-1 at 17.) Price and Marcone discussed the idea in confidence, pursuant to a nondisclosure agreement, but no partnership materialized. (*Id.*) Price went on to develop PartScription, an e-commerce platform that sold not only appliance parts but also various other products one might find at a hardware store. (*Id.*)

Price did not give up on a partnership with Marcone. In January 2017, he again approached the company about partnering on an e-commerce platform. (*Id.* at 18.) Price met

---

[1] Marcone properly removed the action to federal court under 28 U.S.C. § 1441, on the basis of diversity of jurisdiction under 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1391(b)(2).

with and pitched his idea for a partnership to Marcone senior vice-president David Cook and Marcone chief executive officer Jim Souers. (*Id.* at 18–19.) The parties did not reach an agreement to form a partnership. (*Id.* at 19.)

A few days after the meeting, Price emailed Cook and Souers, sending a new proposed nondisclosure agreement. (*Id.*) Over the following months, Price followed up several times. (*Id.*) In July 2017, Price again pitched his proposed partnership to Cook and Marcone chief operating officer Avichal Jain. (*Id.*) Later, Price emailed Cook and Jain to thank them for their time and reiterate the benefits of a partnership. (*Id.* at 20.) No partnership formed and communications dropped off. (*Id.*)

In April 2018, Price emailed Cook and Souers, requesting feedback about their discussions and suggesting that they meet again. (*Id.*) In May, Cook responded by connecting Price to Jeffrey Young, Marcone's IT manager, so they could exchange technical information about the e-commerce platform. (*Id.*) A few days later, Price and Cook discussed a potential business relationship over the phone. (*Id.* at 21.)

In August 2018, Price again followed up by email with Cook, reminding him about their partnership discussions. (*Id.*) In September, Price emailed Cook and Souers to tell them that Ace Hardware had invited PartScription to apply to be an approved vendor. (*Id.*)

On November 4, Price met with Souers, Jain, Cook, and Marcone executive vice-president Greg Fleischut. (*Id.*) At this meeting, they discussed "the value proposition of a combination of" Marcone and PartScription. (*Id.*) "Souers proposed that PartScription and Marcone agree to form a 50-50 partnership," and he and Price "agreed and shook hands ... on the agreement." (*Id.* at 22.) A few days after the meeting, Price emailed Souers to thank him for the

meeting and noted that he looked forward to receiving a term sheet with details of the proposed partnership. (*Id.*)

On December 2, Price emailed Cook and Souers to advise that they should complete the Ace Hardware new vendor application. (*Id.*) He recommended that they speed up efforts to form a partnership and he proposed a timeline for doing so. (*Id.*) Price proposed that Marcone first send him "major terms" to review; they would then address unresolved policies for the Ace Hardware agreement; Price would then review the term sheet; after which, they "would agree to meet and finalize any unresolved elements the week of December 10th, [and/or] sign the term sheet and take the next steps to formalize a partnership agreement implementation timeline." (*Id.*) Cook replied two days later, agreeing with Price's proposed negotiation method over partnership terms. (*Id.*)

On December 17, Price emailed Cook and Souers a proposed draft term sheet. (*Id.* at 23.) The draft outlined terms for "PSM," the name of their proposed partnership. (*Id.* at 32–35.) The term sheet outlined various details about PSM, including, among other things, market strategy, marketing, operations, customer sales and services, various customer policies, pricing strategy, confidentiality among the partners, branding, sharing of revenues, and non-U.S. operations. (*Id.* at 32–35.) The term sheet included a "PSM Partnership Agreement" provision that provided that the partnership would be 50-50, and it laid out what role each partner would fulfill in operating PSM. (*Id.* at 35.) It also contained a term that there would be a joint deposit account for revenues. (*Id.*) Another provision stated that the partnership agreement would be "five (5) years with a mutual right to cancel after year (3), with eight (8) months prior written notice." (*Id.*)

The day after sending the draft term sheet, Price emailed Cook and Souers to share other emails from "individuals in the industry that demonstrated value." (*Id.* at 23.) On December 31,

Price again emailed Cook and Souers with the Ace Hardware Defective Merchandise Policy and Procedure attached for their review. (*Id.* at 24.) Price informed them that they should review the policy and provide "thoughts on what might best fit our prospective partnership." (*Id.*)

On January 22, 2019, Price, Cook, and Jain had a phone call to discuss Price's draft term sheet. (*Id.* at 24, ¶ 64.) On the call, Marcone representatives "stated that they approved of the terms outlined in the Term Sheet but stated that Marcone would not require a joint (PSM) bank account … Jain stated that he would review the [Ace Hardware] Defective Merchandise Policy and provide a recommendation to … Price on how to proceed .... Cook and Jain also stated that ... Young would be Marcone's IT lead and contact … [,] Price to schedule a first meeting with Marcone's IT team." (*Id.*)

On February 2, Price emailed Jain and Cook to confirm their discussions from January 22, noting that "Marcone has approved the terms outlined in the draft PSM term sheet," excluding the term that they maintain a joint bank account, and he asked whether they "need to memorialize" that approval. (*Id.* at 37.) The email also stated that the parties "confirmed PartScription categories to be integrated like vacuum, will not require Marcone to maintain inventories. Instead, those supplier relationships will be integrated in to [*sic*] the Marcone platform for use with current and future PartScription, Marcone and PSM customers." (*Id.*) The email also stated that they "agreed that Sean Young will be Marcone's IT lead and would contact Kevin to schedule a first meeting with our IT team," and it laid out "two implementation paths" for the "face" of the platform that would be built on PSM functionality." (*Id.*) Price concluded by inviting "questions regarding [his] notes and next steps[.]" (*Id.*)

On February 7, Price emailed Jain, Cook, and Fleischut, letting them know about interest from a new potential customer and stating that it was another reason why PSM was a good idea,

4

and he asked to accelerate their progress. (*Id.* at 25.) Jain responded that day and copied Young so that Young and Price could schedule a technical integration meeting. (*Id.*)

On February 12, Price presented Young with a slide presentation on the logistical and technical integration of the PartScription and Marcone platforms, demonstrating optimal integration paths. (*Id.* at 25–26.) After their meeting, however, Young became less responsive to Price's requests to follow through on the agreement to form a partnership. (*Id.* at 26.) Price followed up with Young, Jain, Cook, Fleischut, and Souers on February 25, thanking them for their time discussing "the potential of partnering." (*Id.*) Price received no response.

On March 7, Price emailed Jain and Cook about his upcoming meeting with another potential customer. (*Id.*) Price sought feedback "to resolve the outstanding items we agreed to address and commit to a path to make progress on PSM." (*Id.*) Price received no response.

On March 24, Price emailed Jain and Cook, letting them know that he and Souers had "reached partnership terms for [PSM] ... on November 4" and he was concerned about their progress. (*Id.* at 27–28.) Jain sent Price a meeting invitation for March 28. (*Id.* at 27)

The March 28 meeting was later cancelled. (*Id.*) Price made multiple attempts to schedule a meeting. (*Id.*) In mid-April, Jain responded that Marcone was busy with other initiatives but they would reach out to him in the third quarter of 2019. (*Id.*) Before the third quarter, though, Price continued to email people at Marcone; he received no responses. (*Id.* at 27–28.) In October, Price sent another email asking, "Is now an ideal time to resume our partnership efforts?" (*Id.* at 28.) Price received no response.

## **LEGAL STANDARD**

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. A complaint "must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. On a motion under Rule 12(b)(6), the complaint's factual allegations, not legal conclusions, are taken as true and all reasonable inferences are drawn in plaintiff's favor. *See Iqbal*, 556 U.S. at 678–79; *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 734 (2011).

## ANALYSIS

Marcone moves to dismiss PartScription's action on the grounds that no enforceable oral agreement is alleged and, even if there were, the alleged inclusion of a minimum three-year term for the partnership would run afoul of the limitation in the statute of frauds, 740 Ill. Stat. Comp. 80/1, that oral agreements be capable of being performed within one year. As explained below, the complaint does not allege an enforceable agreement to form a partnership because it lacks definite and certain terms as to what steps PartScription and Marcone agreed to take to form PSM, and those uncertain terms lacked consideration and prevent the court from determining a breach and remedy.

Both parties agree that Illinois law applies in this diversity suit. *See Fednav Int'l Ltd.* v. *Cont'l Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010). Illinois law recognizes a cause of action for breach of an oral agreement to form a partnership, *see Rankin* v. *Hojka*, 355 N.E.2d 768, 774 (Ill. App. Ct. 1976), which is not so different from the run-of-the-mill breach-of-contract claim elements of offer, acceptance, consideration, definite and certain terms, performance by the plaintiff, breach by the defendant, and damages resulting from the breach, *see DiCosola* v. *Ryan*, 44 N.E.3d 556, 560 (Ill. App. Ct. 2015). PartScription characterizes the alleged oral agreement here as an "executory contract," where each party agreed to take certain acts towards forming a

6

partnership that was, essentially, an integration of their respective e-commerce platforms. *See Rankin*, 355 N.E.2d at 772 (one party was to transfer money, supervise building construction, and obtain tenant; the other was to convey property into land trust). As with any contract "to be binding and enforceable, its terms must be definite and certain." *Trittipo* v. *O'Brien*, 561 N.E.2d 1201, 1207 (Ill. App. Ct. 1990). And agreements must be supported by consideration, "the 'bargained-for exchange of promises or performances" that can be based on "some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss of responsibility given, suffered or undertaken by the other." *DiCosola*, 44 N.E.3d at 561 (cleaned up).

*Offutt* v. *Songer*, No. 4-10-0605, 2011 WL 10482172 (Ill. App. Ct. Mar. 28, 2011), although an unpublished order from the Illinois Appellate Court, contains useful guidance on when and how oral agreements to form partnerships come to fruition, even where a written agreement is contemplated. There, three men orally agreed to form a partnership for the purpose of buying an airplane. *Id.* at *5. The court stated that, although the initial agreement to buy "an airplane" was not enforceable because it lacked a basis for determining whether there was a breach and awarding relief, once the men identified a particular plane to buy — a 1971 Learjet 25D — and tendered their shares of its cost, their performance indicated acceptance of the offer to form a partnership. *Id.* Although one of the men believed there was no agreement without a written contract, each man's performance and acquiescence to the others' performance was sufficient to create an enforceable oral agreement. *Id.* at *6. Regarding the contemplation of a written, executed contract, the court noted that where one of the parties begins performance on the agreement and the others are aware, "the writing—if they ever eventually sign a writing— will merely be evidence, or a memorandum, of the pre-existing contract." *Id.* at *7.

7

Here, PartScription's claim mainly rests on the allegation that during the January 22, 2019 call, unspecified Marcone representatives "approved of the terms outlined in the Term Sheet," save for "a joint (PSM) bank account" (dkt. 1-1 at 24, ¶64), thereby "orally accept[ing] PartScription's written terms of the agreement to form the PSM partnership based on the Term Sheet (as supplemented by their discussions during the call)." (*Id.* ¶65; *see also id.* at 25, ¶67 ("the parties agreed to the written Term Sheet exchanged between them").) PartScription also references other points of agreement on partnership terms from the January 22 call, Price's February 2 follow-up email, and the fact that a technical integration meeting occurred on February 12.[2] (*See id.* at 24–25, ¶¶64–67; *id.* at 37.)

Relying on oral acceptance of the term sheet is a nonstarter. It does not contain definite and certain obligations for either party to execute in forming PSM. Although PartScription faults Marcone for failing to appreciate the distinction between agreements to form partnerships and partnership agreements, Marcone's confusion is understandable, for the term sheet reads nothing like an executory agreement, such as in *Rankin* (one party contributed money; the other was supposed to convey property into land trust) or *Offutt* (parties tendered shares of cost to buy Learjet). Rather, it states claims about what PSM "would" or "will be" post integration (dkt. 14 at 9 (quoting dkt. 1-1 at 32)), similar to the initial and unenforceable agreement in *Offutt* to buy an airplane. PartScription implicitly concedes that there is an issue with relying on the term sheet when it claims, in response to the statute-of-frauds argument, that the minimum three-year partnership term is irrelevant to partnership formation.

---

[2] The complaint references other oral agreements to form a partnership from November 2018. (*See* Dkt. 1-1 at 22, 26–27, ¶¶52, 75.) PartScription does not rely on these alleged agreements as the basis of a claim, so this decision does not consider them.

Nor are there any other definite and certain terms gleaned from any other correspondence or actions. The January 22 call and February 2 follow-up email reference general agreements on how the partnership would operate, but, again, no certain obligations for either party to perform. Although the description of the February 12 meeting as a "technical integration meeting" (dkt. 1-1 at 28, ¶80) suggests it was a step towards integration, nothing about the alleged content of the meeting describes the execution of a step towards integration, nor did the parties determine specific formation steps at the meeting.

Because the alleged terms here are uncertain, the other elements fail as well. No consideration is alleged, which for an executory agreement could have been satisfied by reciprocal promises to take certain specific integration steps. And PartScription's complaint and its briefing on the motion lack any mention of or discussion about consideration. Uncertain terms also preclude the court from determining when and how any agreed-upon term was breached. Indeed, PartScription does not connect its claimed damages to any specific breach. Rather, it alleges that the breach is the failure to achieve the ultimate end of forming PSM, and so it seeks potential future profits of PSM and certain expenses that it would not have incurred had PSM replaced PartScription's e-commerce platform.[3] (Dkt. 1-1 at 29, ¶¶84–85.)

Because no enforceable agreement is pleaded, there is no need to reach the statute-of-frauds argument. Accordingly, PartScription's request for discovery to determine whether the signature requirement is met regarding the term sheet is denied, but in any event would be irrelevant because the term sheet cannot support the existence of an enforceable agreement.

---

[3] A further complication, although not necessarily relevant at the dismissal stage, the measure of damages is unclear given that PSM never formed and an underlying combined e-commerce platform never operated, unlike the underlying businesses in *Rankin* and *Offutt*. Even if this claim could progress, Illinois law "precludes expert speculation about possible lost profits" for new businesses. *Meriturn Partners, LLC* v. *Banner & Witcoff, Ltd.*, 31 N.E.3d 451, 459 (Ill. App. Ct. 2015).

## CONCLUSION AND ORDER

Marcone's motion to dismiss (dkt. 11) is granted. The complaint is dismissed with prejudice. The clerk is directed to enter judgment accordingly. This case is terminated.

Date: January 31, 2022

_____
U.S. District Judge Joan H. Lefkow